**In re GULPH WOODS CORPORATION,**
**Debtor.**

**Bankruptcy No. 87–03093S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 11, 1988.

Pace Reich, Philadelphia, Pa., for debtor.

Leonard P. Goldberger, Philadelphia, Pa., Kenneth S. Goodkind, Woodbridge, N.J., for Nassau Sav. and Loan Assn.

Thomas D. Rees, Norristown, Pa., for Upper Merion Tp.

Edward Cohen, Philadelphia, Pa., for John S. Trinsey, Jr.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

On September 14, 1987, Nassau Savings and Loan Association (hereinafter referred to as "Nassau") filed an omnibus motion seeking, *inter alia*, relief from the automatic stay. Thereafter, on October 13, 1987, we entered a Consent Order embodying the substance of a telephone conference agreement between interested counsel that a hearing on the motion would be scheduled on October 19, 1987, and that the stay would remain in place pending the completion of the hearing and disposition of the motion. At that time, it would have seemed inconceivable to us that almost six months would pass before Nassau's motion would be decided. However, when these hearings extended for such a period that, in the interim, both the Debtor and Nassau (twice) filed reorganization Plans, complete with Disclosure Statement hearings embodying scores of cross-objections to the product of the other, we found ourselves obliged to hear testimony on eleven days, most of which were full days,[1] between October 19, 1987, and January 29, 1988, before the record was completed. Then, delays in ordering and completing the transcripts and the parties' completion of Briefs and Reply Briefs suspended the submission of this matter and other related matters to the court until March 31, 1988.

We cannot commend either counsel for the repetition and endless streams of objections to questions which delayed these proceedings. The underlying facts involved a relatively common sort of bankruptcy dispute between a debtor which is the contractor and developer of a 238–unit townhouse and condominium development in suburban Philadelphia, and the former financier of the development. The fact that we have a Debtor's reorganization plan of which confirmation, predictably over the objection of Nassau, is sought allows us to see through the entire case clearly, and avoids the necessity of our hypothecizing on the element of the Debtor's prospects for reorganization. However, we cannot forget that we have before us a § 362 motion, the normative period for disposition of which is to be thirty days, 11 U.S.C. § 362(e), not six months.

Given the foregoing temporal setting, we are obliged to enter our decision quickly, and present it in the swifter strokes of the narrative form, permissible because all that is before us are, in substance, motions.

---

1. By way of contrast, the hotly-contested comparable motions and related debtors' motions in *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376 (Bankr.E.D.Pa.1987), *aff'd,* 75 B.R. 819 (E.D.Pa.1987), despite the presence of several unique issues and numerous adverse parties and an estate which we valued at over $115 million, consumed but six trial days. 71 B.R. at 377.

*See In re Campfire Shop, Inc.*, 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987). We find that the Debtor has no equity in the remaining real estate tract which is its sole asset. We further find that the Debtor's plan of reorganization is most seriously flawed in its dependence on the extremely doubtful management skills of the Debtor's principal, John S. Trinsey, Jr. (hereinafter referred to as "Trinsey"), such that it lacks the element of feasibility, set forth in 11 U.S.C. § 1129(a)(11). We shall therefore deny confirmation of the Debtor's plan of reorganization, grant Nassau's motion in part as to its requests for relief on the basis of 11 U.S.C. §§ 362(d)(1) or (d)(2), and deny all of the Debtor's cross-motions. In addition, however, we shall order Nassau to perform its guarantee, if it were successful in this motion, to provide at least modest dividends to administrative, priority, and unsecured claimants, as set forth in its Modified Liquidating Plan of Reorganization filed on February 24, 1988, all of the other matters before us are rendered moot by this disposition.

## B. PROCEDURAL HISTORY

The instant voluntary Chapter 11 case was filed on June 13, 1987. This was the second filing for this Debtor. On September 23, 1986, the Debtor had previously filed, but agreed to voluntarily dismiss this initial filing on October 3, 1986, when a dispute arose as to whether Trinsey was authorized to file over the opposition of the other two directors of the Debtor, James and John Kolea. At the time of the most recent filing, with a foreclosure sale of Nassau scheduled on the following day, the Koleas apparently consented to the filing.

Nassau's omnibus motion, as indicated above, was filed on September 14, 1987. It alleges that, on May 30, 1984, Nassau made a construction loan in an amount capped at $7,350,000.00 to the Debtor to develop and construct 188 townhouses and 50 condominium on "Rebel Hill," a historical hilltop site in Upper Merion Township, Montgomery County, Pennsylvania.

On May 6, 1986, Nassau commenced foreclosure proceedings against the Debt-

or, Rebel Hill Builders, Inc. (hereinafter referred to as "RHB"), a Trinsey-controlled construction company formed to build the townhouses, and Trinsey, as a personal guarantor of the loan agreement, in this federal district court, at C.A. No. 86–2671. After a trial before the Honorable Norma L. Shapiro, a foreclosure judgment of $6,126,192.66 was entered against all of the Defendants. However, the parties further stipulated that Nassau would make certain additional advances and that the Koleas would come into the picture as prime contractors, as described in greater detail at pages 967–968 *infra,* in order to attempt to complete the project.

Disagreements between Trinsey and the Koleas, the nature of which were not developed at trial, apparently quickly surfaced, because, as indicated below, by September 23, 1986, Trinsey had filed the first, ill-fated Chapter 11 case for this Debtor, over the objection of the Koleas. After the dismissal of that case, construction apparently resumed, and the Koleas managed to complete two buildings totalling twelve of the townhouse units, which were sold and are no longer part of the Debtor's estate, and begin construction of sixteen others. After the departure of the Koleas in early spring, 1987, very little work was performed at the site. Construction of eight units in one building had, as of the Koleas' departure, progressed considerably, but not been completed, and foundation work had been begun on the next building of eight units. In its motion, Nassau, contending that it was now owed in excess of $8 million, sought relief under § 362(d); in the alternative, that the Debtor provide adequate protection as a condition to further use cash collateral; and dismissal of the case or abstention to the district court.

On September 21, 1987, the Debtor countered with a bevy of motions, including a request for permission to use cash collateral; a request to sell four undeveloped lots as a unit to an investor for $220,000.00; or, in the alternative to the latter, for permission to borrow $100,000.00 from a new lending source pursuant to 11 U.S.C. § 364(d). The thesis of the Debtor was that the sale of lots or the loan would

generate sufficient funds to complete and sell the eight-unit building, the proceeds from which could generate further funds to resume work on the next set of units, and so on until the entire complex was completed. By agreement of counsel, these motions, scheduled for a hearing on October 20, 1987, were consolidated for hearing with the Nassau motion.

The Debtor's global plan for the development evolved as it submitted, in turn, its initial plan of reorganization on October 20, 1987; the disclosure statement accompanying that plan on November 6, 1987; amended plans on November 17, 1987, December 1, 1987, and December 9, 1987; and the disclosure statement accompanying the final version of the plan, which we approved on December 9, 1987. Initially, it appeared that the Debtor itself intended to continue building townhouses with the funds generated from sales in the manner described in the last paragraph. However, after Trinsey's initial testimony and review of the disclosure statement, accompanying the initial plan, it appeared that the Debtor contemplated finishing improvement of the lots only and then selling improved lots to third parties to complete the building. However, after testimony from Nassau's consultant, Thomas Finn, revealed the impracticability of individually selling "townhouse lots," the construction on which contemplated structures containing four to eight units, a final plan and disclosure statement emerged. We were then informed that Trinsey had formed a new corporation, Rebel Hill Contractors, Inc. (hereinafter referred to as "RHC"). The Debtor's contracts to sell the improved lots were then projected to include a provision that RHC would be the exclusive builder, unless all of the owners in a particular townhouse chose another builder. However, any other builder was to be obliged to build in accordance with the particular house-designs conceived by the Debtor.

The Debtor's exclusivity period to file a plan expired and was not extended. Nassau filed a competing plan on December 21, 1987, but we denied Nassau's request to dispatch its disclosure statement simultaneously with that of the Debtor, wishing to give the Debtor a clear chance at preparing and soliciting acceptances on its own plan.

The hearing on the consolidated motions were conducted on most of the court's clear days after it began, i.e., on October 19, October 20, October 16, November 6, November 10, November 16, November 30, and December 4, 1987. Thereafter, a delay in production of the transcript arose when Trinsey failed to pay his share of same, which we ultimately ordered his counsel to pay. The transcript was not completed as of the dates of the confirmation hearing on the Debtor's plan, conducted on January 14, January 26, and January 29, 1988. On February 3, 1988, we ordered the parties to simultaneously submit proposed Findings of Fact, Conclusions of Law, and Briefs addressing all of the outstanding motions and the issue of whether the Debtor's plan could be confirmed within thirty (30) days after completion of the transcripts, and to file Reply Briefs ten (10) days thereafter.

Meanwhile, voting on Nassau's initial plan, which was scheduled for a confirmation hearing on March 1, 1988, proceeded. This plan contemplated a liquidation which, given Nassau's valuations of the realty as less than its secured debt, rendered it likely to be the recipient of all of the liquidation proceeds. When this plan received less than a warm reception from most other creditors, Nassau, on February 24, 1988, filed a modified Plan which carved out dividends of $750.00 to all administrative and priority claimants and $1,000.00 to all unsecured claimants, including purchasers who had made deposits with the Debtor in contemplation of sales. A confirmation hearing on this modified plan is scheduled on April 21, 1988.

In response to our Order of February 3, 1988, Nassau and the Debtor delivered comprehensive submissions, and Upper Merion Township also offered submissions, addressing only the purported lack of feasibility of the Debtor's plan. All of these were in our hands in timely fashion on March 31, 1988. In its Reply Brief filed on the latter date, Nassau offered to pay the carve-outs to other claimants described in the above paragraph even if it were grant-

ed relief from the stay and the confirmation process became, essentially, moot. We shall expressly hold Nassau to this commitment in providing relief to it.

Before summarizing the testimony; making, albeit in narrative form, our significant factual findings regarding the amount of Nassau's claim, the value of the Debtor's realty asset, and the feasibility of the Debtor's plan; and applying the pertinent legal principles, there are several issues that bear mentioning. First, on February 8, 1988, we issued a Memorandum, reported at 82 B.R. 373, addressing questions reserved at trial and separately briefed by the parties relating to the admissibility of two categories of exhibits offered by Nassau and objected to by the Debtor. In the first category were two Orders of the Pennsylvania State Ethics Commission concluding that two township supervisors had violated the State Ethics Act in accepting, from Trinsey, expense-paid trips to the Henley Regatta in England which potentially influenced their votes approving the development plan of the Rebel Hill project in issue and another development project of entities controlled by Trinsey, referred to as the Port Henley or River Project.[2] We admitted these documents solely for the purpose of rebutting specific testimony of Trinsey regarding the events described therein.

In the second category were two computer printouts offered through Brian Christie, an assistant vice-president of Nassau, which purported to compute the Debtor's loan balance as of June 30, 1987, and November 30, 1987, respectively. In our Memorandum, we rejected all of the Debtor's objections thereto except those based upon Federal Rule of Evidence (hereinafter referred to as "F.R.E.") 1002, a restatement of the "best evidence rule," because we were uncertain, without the benefit of the transcript, as to whether the record included sufficient foundation for their

preparation to allow us to categorize them as "originals" not within the scope of F.R. E. 1002. 82 B.R. at 377–78. Our review of Mr. Christie's testimony of December 4, 1987, with the transcripts in hand, convinces us that the requisite foundation was laid. On cross-examination by the Debtor's counsel, Mr. Christie expressly stated that these documents represented print-outs of the daily records from Nassau's computer system, for which he is personally responsible. These statements are, hence, the modern equivalent of a daily ledger and are "originals" as defined by F.R.E. 1001(3). The Debtor's lengthy commentary on this issue in its current Brief fails to discuss the crucial element of the applicability of F.R. E. 1001(3), despite our indication of the significance of same in our Memorandum. *Id.* at 377. We shall therefore admit these print-outs into evidence.

On March 11, 1988, we issued a Memorandum and Order, presently reported only at 83 B.R. 339, 17 B.C.D. 257, addressing a motion by Nassau seeking a variety of relief from Trinsey for allegedly improperly soliciting rejections of Nassau's initial plan. This claim arose due to Trinsey's dispatch, on February 5, 1988, of letters to all creditors urging them to reject ballots with Nassau's plan, together with ballots pre-marked with "rejects" and self-addressed envelopes requesting that same be returned to him. Finding the dispatch of the pre-marked ballots and self-addressed envelopes improper, we nevertheless imposed only mild relief to Nassau, i.e., that Trinsey obtain court approval before making any further communications to creditors relating to Nassau's modified plan.[3] In a Memorandum issued to explain our ruling on this issue, we mentioned, in passing, 83 B.R. at 339–40, 17 B.C.D. at 258, that Trinsey had filed five bankruptcy petitions on behalf of other corporations which he had controlled since 1972, and had re-

---

**2.** On or about November 13, 1987, Trinsey filed a *pro se* civil action in this federal district court, at C.A. No. 87–6975, against the State Ethics Commissions and the Board of Elections of Montgomery County seeking to, *inter alia,* declare the Orders of the Board null and void.

We are advised that, on March 15, 1988, the district court entered an order dismissing the claims against the State Ethics Commission.

**3.** We nevertheless note that Trinsey had appealed, *pro se.* from this Order.

cently filed the second of two personal bankruptcies.

The reference to these prior filings in that Memorandum (and probably the anticipation of an adverse decision in the matters addressed herein) apparently motivated Trinsey to file, *pro se,* on March 30, 1988, the eve of the completion of briefing, a lengthy and vituperative Affidavit of Prejudice and/or Bias of this court against the Debtor and him, pursuant to 28 U.S.C. § 144.[4]

█ Although this Affidavit could arguably be disregarded because it was not brought before this court in a form appropriate for disposition, i.e., by a motion, and it is not certified (and apparently is not joined) by counsel, we read the Court of Appeals' decision in *Smith v. Danyo,* 585 F.2d 83, 85–86 (3d Cir.1978), as a directive to overlook procedural deficiencies in such filings and to resolve them on their merits promptly. We shall therefore clear the air by denying this recusal request on its merits.

The motion must be denied for two reasons. First, it alleges bias and prejudice which could have arisen only in the context of our hearing this case, as opposed to "extra-judicial bias," which is the sole focus of 28 U.S.C. § 144. *See, e.g., In re Khan,* 751 F.2d 162, 164–65 (6th Cir.1984); *Johnson v. Trueblood,* 629 F.2d 287, 290–91 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *Smith, supra,* 585 F.2d at 87; and *Resident Advisory Board v. Rizzo,* 510 F.Supp. 793, 796 (E.D.Pa.1981). Trinsey does not and indeed could not allege any extrajudicial knowledge of the facts or contacts between the court and him.

Secondly, the request is most untimely, coming after this court has literally suffered through eleven days of testimony which we would, in any event, hesitate to visit upon another judicial officer a second time. As *Smith* indicates, "courts are particularly reluctant to entertain § 144 motions shortly before the trial *is to begin* (emphasis added)," 585 F.2d at 86, let alone after the trial is ended. *See, e.g., Franks v. Nimmo,* 796 F.2d 1230, 1233–35 (10th Cir.1986) (filing of a recusal after motion for summary judgment was presented to the court is untimely); and *United States v. Studley,* 783 F.2d 934, 939 (9th Cir.1986) (recusal motion filed after the conclusion of the trial is "presumptively untimely"). Accordingly, we shall deny Trinsey's request that we recuse ourselves in our accompanying order.

## C. FINDINGS OF FACT

Summarizing the testimony presented in the course of these proceedings, is, in one sense, difficult because of its bulk, and, in another sense, easy because of its repetition. Nassau was represented by two attorneys, a New Jersey attorney who we assume is on retainer from Nassau, and a young but experienced local practitioner from a large prestigious Philadelphia firm. Unfortunately, these co-counsel developed the habit of prompting and whispering to each other and improperly interrupting opposing counsel's presentation with comments and asides. Repetitive and excessively broad questions from these counsel and objections thereto, often excessive in their length, by the Debtor's counsel fill the record. Towards the end of this proceedings, Trinsey saw fit to have his own private counsel present; although two different attorneys appeared in this capacity

---

**4.** This statutory provision reads as follows:

§ 144 Bias or prejudice of judge

Whenever a party to any proceeding in a district court makes and files *a timely and sufficient affidavit* that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reason for the belief that bias or prejudice exists, and *shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.* A party may file only one such affidavit in any case. It shall be accompanied by a certificate *of counsel of record* stating that it is made in good faith. (emphasis of provisions addressed *infra* added).

in the course of this case, they were thankfully almost silent.

Exacerbating the tactics of counsel which served to delay these proceedings was the virtual inability of Trinsey to answer any question put to him by any counsel either directly, concisely, or quickly. The trial thus began ominously, with Nassau's counsel calling Trinsey as of cross-examination. To describe this combination of questioner and answerer as tedious is an understatement. Moreover, Trinsey appeared again as a witness for the Debtor and again on rebuttal in the hearings on the consolidated motions, and yet again in the confirmation hearing, and was cross-examined on most of these occasions. The record therefore contains literally volumes of Trinsey's verbose testimony.

We shall now set forth the basic facts not already recited; identify the particular disputed factual issues; offer our assessment of the crucial witnesses' credibility; resolve the disputed facts; and then apply the controlling legal precepts to these facts.

In March, 1984, Trinsey approached Nassau for a construction loan to build the Rebel Hill development, which is located on a most attractive hilltop setting on the outskirts of the prestigious Philadelphia "main line" suburban area. Prior to approaching Nassau, Trinsey had been the principal of Tri–Kell, Inc. which had owned about two-thirds of the Rebel Hill realty, went into bankruptcy, and sold its property to another corporation, which in turn sold it to the Debtor in this proceeding. Trinsey was also the principal of four other separate corporate entities involved in bankruptcy proceedings in this court, all of which apparently concerned his Port Henley or River Project. Only one of seven projects in which he has been involved has been successful.

On May 16, 1984, Nassau executed a commitment letter to fund the Rebel Hill project in the amount of $7,350,000.00. The commitment letter included a condition that Nassau must obtain a financial participant and that plans and specifications for the project must be submitted to it by the Debtor. The loan was closed on May 30, 1984, incorporating the terms of not only the commitment letter but also a letter of May 29, 1984, which amended the commitment letter of May 16, 1984. Neither party has been able to locate or produce a copy of the May 29, 1984, letter. The parties agree that the condition requiring a participant was waived therein, but it is disputed whether the requirement that Trinsey supply plans and specifications was also waived therein. (Issue No. 1).

Between May 30, 1984, and April 22, 1985, construction commenced and Nassau made advances on all vouchers submitted. On the latter date, it ceased doing so. Nassau, through the testimony of its vice-president in charge of the loan from May, 1985, through September, 1986, Kevin McCourt, contended that this action was taken due to the Debtor's failure to supply plans and specifications. The Debtor contended that Nassau ceased funding solely due to the loss of a participant who had, until that time, funded ninety (90%) percent of the transaction. Funding by Nassau was nevertheless resumed on July 23, 1985. The Debtor claims that Nassau's breach of the contract from April 23, 1985, through July 23, 1985, prevented it from fully performing under the contract. These alleged defaults, and the reasons therefor, are disputed. (Issue No. 2).

The alleged defaults led to the foreclosure action in federal court in May, 1986. The upshot of this action was the judgment in foreclosure in the amount of $6,126,192.66 against the Debtor, Trinsey and RHB noted at page 963 *supra;* a Stipulation of May 21, 1986; and an Amended and Restated Loan Agreement of June 12, 1986, between Nassau and the Debtor. Pursuant to the Stipulation, the Debtor, Trinsey, and RHB entered into an Agreement to hire the Koleas as prime contractors to finish certain roads, site improvement, and twenty-eight (28) units and Nassau agreed to resume funding plus pay an advance of $415,000.00 to the Upper Merion Sewer Authority. The Koleas left the job in early spring, 1987, for reasons which neither party saw fit to develop in

the record. Whether either party violated the terms of the Stipulation of May 21, 1986, is also in dispute. (Issue No. 3).

After the departure of the Koleas, Nassau took possession of the realty until after the commencement of these proceedings in late October, 1987, when the Debtor regained possession with only faint opposition from Nassau. However, since the Debtor had no lines of credit and no funds to proceed with construction, the project has ever since remained in a state of suspended animation. We consider it significant to resolve this matter quickly, in order that the rights of innocent prospective purchasers can be settled and in order that a beautiful tract of land can be developed.

A significant issue in dispute is the amount of the loan balance owed by Trinsey to Nassau. (Issue No. 4). Trinsey argues, alternatively, that Nassau's alleged breaches of the original contract and the district court stipulation should wipe out the loan balance entirely(!) or that the loan balance should be capped at the maximum figure recited in the original contract and the stipulation, i.e., $7,350,000.00. Nassau contends that the loan balance as of the date of the petition was almost $8 million, and that continuing accrual of interest has raised the balance to almost $9 million.

The final issue in dispute is the present value of the realty. (Issue No. 5). The Debtor's witness, William D. Pugliese, testified that it was worth slightly in excess of $10 million. Meanwhile, Nassau's witness, Paul R. Sullivan, pegged its value at only $7 million.

We are now prepared to address our assessment of the witnesses and their relative credibility. After our extended exposure to same, we feel that we can evaluate Trinsey's credibility on the basis of considerable data. He is a former Olympic rowing champion, remains vigorous and energetic, and is a convinced and convincing salesman of himself as a builder and developer and of the Rebel Hill project, to which he has devoted nearly thirty (30) years of his life. On the other hand, he is impulsive, lacking in sustained managerial ability, and capable of gross self-deception.

Thus, the accuracy of any utterance he makes is suspect, not because he consciously recites untruths, but because his perceptions are distorted.

Nassau's witnesses included several vice presidents: the abrupt and not particularly compassionate Thomas Moskal; McCourt, who has left Nassau after being in charge of the Debtor's loan in the crucial period from May, 1985, to September, 1986, and gave the impression that he was one in the series of revolving-door appointments to his position; and Christie, whose knowledge of the transaction was confined to papers contained in Nassau's accounting department. All impressed us as generally credible, but we gained the distinct impression that Nassau never properly evaluated the loan transaction from the outset. It further appeared that Nassau's changes in personnel, who reacted in different ways to Trinsey's strong personality, resulted in an inconsistent approach of Nassau in dealing with Trinsey and with the Rebel Hill project. Thus, at times Nassau's management appeared prepared to tolerate Trinsey's obvious managerial deficiencies on the theory that the attractiveness of the site and the project would cause it to succeed in spite of him. At other times, they appeared ready, without much warning, to lower the boom on him as they did in April, 1985, and again in May, 1986. Their inconsistency in handling this matter is certainly in large part responsible for most of their losses. Their present refusal to deal further with Trinsey appears justified.

Perhaps the most impressive and reliable witness concerning the assessment of the development and the deficiencies of Trinsey's skills was Finn, an outside consultant hired by Nassau in June, 1985, to survey the project. His valuation of Trinsey's performance was not marked by the generalities of the other Nassau witnesses, but by a myriad of specific examples. We find his evaluation of Trinsey as a person unable to delegate any aspect of the development and as a self-proclaimed "Jack-of-all-trades" and certainly not a master of the building trade to be very convincing. We find his assessment that Trinsey made too many

customized alterations in his basic house plans to successfully develop and build this project to be accurate. We credit his accounts of Trinsey's procrastination in supplying plans and specifications and failure to do so as fatal to the parties' relationship. Meanwhile, Trinsey's rebuttal testimony that he always supplied plans and specifications on the dates required, in which he was led by his counsel to mimic dates printed on plans placed before him, was totally unconvincing.

It was difficult to choose between the two experts on valuation, Pugliese and Sullivan. Both had a sufficient degree of disengagement from the project to retain objectivity and both had equally impressive professional qualifications.

Pugliese runs a one-man operation, and he is highly knowledgeable about all facets of real estate in the area. However, his testimony was brief, and he admitted that he had not done a formal appraisal of the property in arriving at his value figure of $10,020,000.00 of the premises. He did produce a copious number of prior appraisal reports. The first three, produced prior to the commencement of the contractual relationship between the parties, undertook only to value the property upon completion. The figures recited, as of March 29, 1982; November 22, 1982; and April 16, 1984, were $23,912,800.00; $23,713,700.00; and $28,000,000.00, respectively. These submissions are interesting, but not really very helpful, as the project is far from completion. Only his final appraisal, a brief "update" produced on May 27, 1986, is really pertinent. At that time, the entire project consisting of twenty-eight (28) townhouses on which work had begun and 210 remaining lots was valued at $9,200,-000.00. However, it must be recalled that this valuation included the twelve (12) townhouses which were subsequently sold and are hence no longer part of the Debtor's property. He also agreed that if Trinsey, given his poor track record, remained in possession of the lots to complete the building on same, his valuation would possibly drop as low as $9 million.

Sullivan, on the other hand, is employed by Cushman & Wakefield, a large realty firm, and he specializes exclusively in making appraisals. His work product was a complete, current appraisal, with full use of illustrated comparables, an undertaking which Pugliese candidly conceded that his engagement had not left him time to do. Also admitted into evidence at the request of the Debtor was a previous, equally-complete appraisal performed by Sullivan as of June 21, 1985. At that time, he valued the entire tract of realty "as is" at $5,250,-000.00. He also projected that the first sixty (60) units, if properly completed, would be valued at $7,642,500.00; and that the fee simple value of the remaining 178 lots, at completion of the first sixty units, would be $3,400,000.00. These figures are consistently much more modest than those of Pugliese.

The Debtor's counsel launched an attack upon Sullivan's valuation by attempting to break his work-product into per-lot components, and by attacking his adjustment for time value which assumed a three-year lag in selling the units. Given Sullivan's unassailable independence, competency, and the complete nature of his work-product, we are inclined to greater credit his calculations and believe them to be unshaken by the Debtor's efforts to prove them inaccurate. However, weighing his testimony and exhibits against those presented by Pugliese, we conclude that the present value of the realty in issue is $8 million.

In light of our foregoing assessments of the witnesses, we shall now attempt to resolve Issues No. 1 through 4. We find that the parties' contract of May 30, 1984, as McCourt testified must have been the case, did include a requirement that the Debtor produce plans and specifications. It is difficult for us to conceive of how such a significant construction contract could have omitted such a requirement. Besides, Trinsey testified that he did produce such plans and specifications, despite his alternative contention that he need not have done so.

With respect to the second issue, we believe that, as McCourt and Finn testified,

Trinsey did fail to provide plans and specifications as requested. It does appear that Nassau treated Trinsey's breaches of the requirement to provide plans and specifications with a certain degree of equivocation, causing the issues of materiality of Trinsey's breaches or Nassau's waiver of same to create potential defenses to Nassau's claims.

However, all breaches which occurred prior to May 21, 1986, were merged into the mortgage foreclosure judgment and stipulation of the parties of that date. In this regard, we note the observations of Judge Shapiro in the excerpts from the recent proceedings before her in December, 1987, and January, 1988, in the foreclosure suit. In these proceedings, Nassau attempted to return to the district court to enforce its judgment against Trinsey individually and prevent him from personally realizing the proceeds of the sale of an option (which fell through), and Trinsey's counter-attempts to prevent Nassau from voting on his plan of reorganization because of the alleged total invalidity of its claims. Judge Shapiro refused to look behind the judgment entered by her without proof of convincing reasons for doing so, which she found had not been presented, and intimidated that this court was without powers to look behind the district court judgment, either.

The relevant authorities do suggest that a bankruptcy court's power to review even *state* court *default* judgments are limited. *See Heiser v. Woodruff*, 327 U.S. 726, 732–37, 66 S.Ct. 853, 856–58, 90 L.Ed. 970 (1946); *Kelleran v. Andrijevic*, 825 F.2d 692, 964–95 (2d Cir.1987); *Werts v. Federal National Mortgage Ass'n*, 48 B.R. 980, 985 (E.D.Pa.1985); and *In re Farrell*, 27 B.R. 241, 245–47 (Bankr.E.D.N.Y.1982). Exceptions may arise if the state court judgment is constitutionally deficient, *see In re Souders*, 75 B.R. 427, 432–33 (Bankr.E.D.Pa. 1987), or if the judgment has been fraudulently procured. *See, e.g., Browning v. Navarro*, 826 F.2d 335, 344–46 (5th Cir. 1987); *Margolis v. Nazareth Fair Grounds & Farmers Market, Inc.*, 249 F.2d 221, 224–25 (2d Cir.1957); and *Bowers v. Connecticut Nat'l Bank.*, 78 B.R. 388, 393–94 (D.Conn.1987). *Cf. Gregory v. Chehi*, 843 F.2d 111, 119–21 (3d Cir.1988) (res judicata does not bar claims which are not inextricably tied to matters previously litigated or as to persons not parties to the proceeding which resulted in a judgment).

We perceive nothing on this record which would prompt us to look behind the federal district court foreclosure judgment entered by Judge Shapiro. Judge Shapiro herself refused to do so, even in the context of motions specifically requesting same. We think our refusal to look behind this judgment effectively precludes our resolving the first and second issues favorably to the Debtor, even provided that we had any inclination to do so, which we do not.

We also believe that the presence of the district court judgment touches upon the third issue, which relates to whether Nassau or the Debtor or both are guilty of violating the terms of the stipulation approved by Judge Shapiro on May 21, 1986. We have a distinct reluctance to endeavor to determine whether either party violated the terms of our own district court's decree, believing it to be the exclusive province of that court to do so. Moreover, the record here is most unclear on the issue of how or who is responsible for any breaches of the stipulation which occurred. One thing is certain: the Koleas are no longer at the site and they only partially completed their contemplated engagement. Neither party saw fit to call the best witnesses of why and how this came to be, i.e., the Koleas themselves. We do know of friction between the Koleas and Trinsey as early as the date of the filing of the previous bankruptcy case of the Debtor on September 23, 1986. It does appear that Nassau did not pay the $415,000.00 sum to the sewer authority. On the other hand, it did advance in excess of $1 million subsequent to May 21, 1986.

We are therefore unable to resolve the third issue in favor of either party, and we believe that a resolution of this issue in favor of the Debtor would be necessary to prevent us from resolving the fourth issue (the proper amount of Nassau's claim) consistently with the testimony and the exhib-

its offered through Christie. Our decision to admit into evidence Exhibits N–45 and N–46, the print-outs setting forth the balance of the secured debt of the Debtor to Nassau, resolves this issue. These support a finding of a pre-petition indebtedness of $7,900,717.00, increasing to a figure approaching $9,000,000.00 to date. Given the Debtor's lack of any evidence or reason why these specific figures or calculations are inaccurate other than the broad attacks to the validity of any indebtedness of the Debtor to Nassau, we are inclined to accept the accuracy of same.

We do not consider the principal rebuttal offered by the Debtor in its Briefs, i.e., that the restated loan contract and stipulation capped the loan at $7,300,000.00, should effectively limit the balance to this figure. The Debtor accepted sums which apparently brought the principal balance up to a sum in excess of $7,300,000.00, thus waiving any such this provision. Furthermore, this provision was apparently included as a limitation on Nassau's obligations to lend rather than its rights to recover for amounts actually advanced. Finally, we are unwilling to read this term in such a way as to prevent Nassau from collecting any interest, no matter how long payment is delayed, if the Debtor persisted in failing to pay after the balance reaches $7,300,-000.00 or more.

We have already determined Issue No. 5 by weighing the expert testimony of Messrs. Pugliese and Sullivan, and arriving at a present valuation of the Debtor's realty asset at $8 million.

Determination of these issues resolves the material factual matters before us for disposition. We now are able to apply the pertinent legal principles to this set of facts.

### D. WE ARE NOT PREPARED TO DISMISS OR ABSTAIN FROM HEARING THE DEBTOR'S CASE

■ Nassau devotes some attention in its Briefs to that portion of its motion requesting that we dismiss the case entirely on the basis of the Debtor's purported "bad faith" in filing the petition or that we abstain, pursuant to 11 U.S.C. § 305(a), and transfer this case *in toto* to Judge Shapiro in the district court. We reiterate, at outset, our observations in *In re Latimer,* 82 B.R. 354, 363–64 (Bankr.E.D.Pa.1988), that it is doubtful whether there is a requirement that a Chapter 11 case be *filed* in good faith, as contrasted with the express requirement that a Chapter 11 plan be *proposed* in good faith, pursuant to 11 U.S.C. § 1129(a)(3). As the result herein exemplifies, the Bankruptcy Code contains ample protections for creditors when the position of a debtor lacks merit, without allowing purely subjective broadside attacks upon debtors under the vague rubric of "bad faith." Moreover, even assuming *arguendo* that some limited concept of a good-faith requirement exists, to weed out purely abusive filings, *see In re Smith,* 77 B.R. 496, 500 (Bankr.E.D.Pa.1987); and *In re Clinton Centrifuge, Inc.,* 72 B.R. 900, 903–08 (Bankr.E.D.Pa.1987), we cannot say that the Debtor, which has proposed at least a plausibly-confirmable plan, was not motivated by a legitimate intention to effect a successful reorganization.

■ Nassau's suggestion that this court should consider abstention at this juncture is equally as ill-timed as Trinsey's request that we recuse ourselves. Assuming *arguendo* that this case fell within the narrow class of cases where all interested parties would be equally better served by our abstention, *see In re T.D.M.A., Inc.,* 66 B.R. 992, 995 (Bankr.E.D.Pa.1986), which we greatly doubt, the time for seriously pressing such a contention was before rather than after Nassau participated in eleven days of testimony in this case.

### E. NASSAU IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY, PRINCIPALLY BECAUSE THE DEBTOR'S PLAN IS NOT FEASIBLE

Nassau fares considerably better in the more conventional portion of its motion seeking relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), which reads as follows:

(d) On request of a party in interest and after notice and a hearing, the court

shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

    (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

    (2) with respect to a stay of an act against property under subsection (a) of this section, if—

    (A) the debtor does not have an equity in such property; and

    (B) such property is not necessary to an effective reorganization.

We have frequently construed this section in the context of consumer cases, *see, e.g., In re Capodanno,* 83 B.R. 285, 288–89 (Bankr.E.D.Pa.1988); *In re Kessler,* 76 B.R. 434, 437–39 (Bankr.E.D.Pa.1987); *In re Mitchell,* 75 B.R. 593, 597–600 (Bankr.E.D.Pa.1987); *In re Crompton,* 73 B.R. 800, 809–12 (Bankr.E.D.Pa.1987); and *In re Tashjian,* 72 B.R. 968, 973 (Bankr.E.D.Pa.1987), as well as in the context of business cases, *In re Cann & Saul Steel Co.,* 76 B.R. 479, 484–88 (Bankr.E.D.Pa.1987); and *Grant Broadcasting, supra,* 71 B.R. at 384–89.

While § 362(d) recites two alternative bases for granting relief from the automatic stay arising by force of the bankruptcy filing, we believe that the two alternatives are more alike than appears to be the case at first blush.

Section 362(d)(2) requires a mechanical determination of whether the Debtor has equity in the property against which relief from the stay is sought to proceed. As Judge Fox notes in *In re Liona Corp.,* 68 B.R. 761, 766 (Bankr.E.D.Pa.1987), the concept of equity is determined, in this context, by whether the value of the property exceeds the liens against it. *Accord, Crompton,* 73 B.R. at 811. The value of the property here is determined by us to be $8 million. Nassau's pre-petition debt of $7,900,717.00 closely approaches that figure and, with the continuing accrual of interest, has, by this time, clearly surpassed it. We reach this result without making reference, as Nassau urges in its Brief, to Schedule A–2 of the Debtor's

schedules. Although Schedule A–2 apparently includes a listing of some other secured claims against the realty in issue totaling over $500,000.00, this document was not admitted into the record here, large as it is, and we cannot consider it. *See In re Aughenbaugh,* 125 F.2d 887, 889 (3d Cir.1942); and *In re Nicolet, Inc.,* 80 B.R. 733, 742–43 (Bankr.E.D.Pa.1987).

However, Nassau is also obliged to satisfy the requirement of § 362(d)(2)(B), i.e., the lack of necessity of the property to the effective reorganization of the Debtor, in order to obtain relief from the automatic stay on the basis of § 362(d)(2). This Code section requires us to focus upon the concept of whether "there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations." *In re 6200 Ridge, Inc.,* 69 B.R. 837, 843 (Bankr.E.D.Pa.1987). *Accord, United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* —— U.S. ——, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988); and *Crompton, supra,* 73 B.R. at 811.

On the other hand, § 362(d)(1), focusing upon whether the secured party has "cause, including lack of adequate protection" of a moving party's interest, focuses, as we indicated in *Tashjian, supra,* 72 B.R. at 973, upon the following considerations:

we believe that determination of whether a secured lender received "adequate protection" from a debtor requires an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan.

The first components of this test, the value of the collateral and the likelihood of depreciation or appreciation, are very much like the "equity" requirement of § 362(d)(2)(A). There is, of course, the distinction that § 362(d)(1) focuses on protection of the movant's interest instead of the debtor's equity position generally. However, here the movant's claim is so large relative to that of other secured creditors

that the existence of equity is almost the same consideration. The other components, relating to successful reorganization and performance in accordance with a plan, are very much like the "reasonable likelihood of reorganization" requirement of § 362(d)(2)(B).

Normally, when a § 362(d) motion is filed at the outset of the case, the court must effectively gaze into the hypothetical crystal ball and predict whether the Debtor can formulate a successful reorganization plan. However, here, the parties, by their stipulation at the outset of the hearings on these motions, extended the disposition of the § 362(d) in issue until after a hearing on confirmation of the Debtor's plan had been held. Therefore, the issue of confirmation is before the court co-terminously with the § 362(d) hearing. We were compelled to engage in the normative projections and predictions in *Cann & Saul, Grant Broadcasting, Crompton,* and *Mitchell.* In all of these cases, we required the respective debtors to toe the line of their projections which they contended would lead to a successful reorganization. However, as particularly *Mitchell,* 75 B.R. at 598–601, points out, we were quite willing to give the debtors the benefit of the doubt, at any early stage of the case, in hypothecizing whether the debtors could present, and perform according to the terms of, a feasible plan.

Here, however, for better or for worse, the Debtor's plan appears full-blown before us. Due to the ingenuity and tirelessness of the Debtor's able counsel, the Plan appears, on its surface, to meet all of the prerequisite Code requirements. Anticipating the vote of Nassau against the Plan, the Debtor goes the only route left to it, i.e., 11 U.S.C. § 1129(b). In order to impress us with the fairness and equity of the Plan, counsel even prepared and admitted into evidence detailed Cash Flow Assumptions, which show how the projected lot sales to RHC will be made and how Nassau would be paid in full under the Plan, even if its disputed claim is upheld.

█ Nassau levels a classic scattergun attack at the proposed plan, asserting that it violates every provision of §§ 1129(a) and (b) except §§ 1129(a)(10) and (a)(12). We· believe that a portion of this attack, despite its lack of focus, hits home, i.e., the invocation of 11 U.S.C. § 1129(a)(11), which states as follows:

§ 1129. Confirmation of plan

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The components of this "feasibility" requirement of 11 U.S.C. § 1129(a)(11) are uniformly recognized to require that the court focus upon whether the debtor's plan takes into account the following elements:

(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re U.S. Truck Co.,* 800 F.2d 581, 589 (6th Cir.1986). *See also, e.g., In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984); *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr.D. N.J.1980); and 5 COLLIER ON BANKRUPTCY, ¶ 1129.02[a], at 1129–36.13 (15th ed. 1987).

Most of the cases which deny confirmation on the basis of 11 U.S.C. § 1129(a)(11) do so after an analysis which leads to a conclusion that the Debtor's projections are either insufficiently clear or are visionary or clearly overly optimistic. *E.g., In re Prudential Energy Co.,* 58 B.R. 857, 862–67 (Bankr.S.D.N.Y.1986); *In re Stuart Motel, Inc.,* 8 B.R. 48, 49–50 (Bankr.S.D.Fla.

1980); and *Landmark, supra,* 7 B.R. at 659–63.

Upper Merion Township submitted a Brief and Reply Brief here objecting to confirmation of the plan on the ground that the Debtor has not accounted for a need to post an additional escrow payment for site improvements of almost $500,000.00 before it can begin work on any but the first phase of 60 townhouses. Trinsey, in typically bull-headed fashion, claimed that the Township had agreed that the deposits previously submitted were sufficient for the entire project. Township Manager Ronald G. Wagenmann, despite efforts of the Debtor's counsel to shake same byprolonged cross-examinations, clearly conveyed to us that no such agreement had been reached.

This point of difference is significant not only because it reveals a deficiency in the Debtor's Cash Flow Assumptions (the more commonly-used term "cash flow projections" is probably intentionally not used, due to the wishfulness of this submission), but also because it is symptomatic of Trinsey's tendency to face problems or attempt to resolve matters in a confrontational manner. On a recess in the midst of Mr. Wagenmann's testimony, it was reported to us by the Township's solicitor that Trinsey threatened to see that both Wagenmann and the Solicitor "would not last another 24 hours" in their respective positions. This is reminiscent of Trinsey's earlier denunciations of his former counsel as the party responsible for all of the problems leading to previous bankruptcies. The list of "enemies" whose differences with him have been expanded to include Nassau, Township officials, the State Ethics Commission, prior counsel, and this court.

The factor that makes this plan infeasible is its ultimate dependency upon RHC, i.e., Trinsey in another corporate hat, as the builder. We were impressed, as we indicated above, by Finn's assessment of Trinsey's conception of development and building of the townhouses in issue as totally incompetent and unacceptable. Trinsey could not succeed with sufficient financial backing. It is difficult to see how anyone could be optimistic about his chances for success without financial backing, confined to dependence on his doubtful skills as a manager and builder of the project. Thus, the success of this plan being contingent upon the ability of RHC to complete this project, it is, in our view, truly visionary to predict success.

Trinsey's track record is abysmal. Only one of his numerous building projects was successful. As indicated above, he has filed bankruptcies for five other corporate entities of which he was a principal, at various times over the past fifteen years. In one of these, our predecessor, Judge King, was particularly critical of the dilatory tactics of the Debtor. *See In re East Redley Corp.,* 20 B.R. 612, 614–15 (Bankr. E.D.Pa.1982). He has filed two personal bankruptcies. He has filed two bankruptcies for this particular debtor, the initial filing being based upon totally misguided notions of Pennsylvania corporate law to which he still clings. His personal attacks upon all who have disagreed with his particular analysis of the facts are symptomatic of extremely poor judgment. We therefore have little doubt that, if we confirmed this plan, RHC would, within short order, follow this particular Debtor into bankruptcy. We also do not doubt that Trinsey would be prepared, with equal vigor and force of conviction to that displayed here, to attribute his difficulties to new whipping boys other than himself.

In sum, we have before us the archetypal case where the probability of continuation of management combined with proven inability to manage in the past dooms a plan to almost certain defeat on the basis of its lack of feasibility. We must therefore deny confirmation of the Debtor's Third Amended Plan.

We are, consequently, constrained to grant Nassau's § 362(d) motion. *Compare Landmark, supra,* 7 B.R. at 663. It is apparent to us that the Debtor cannot propose an alternative, effective reorganization plan pursuant to § 362(d)(2)(B). The poor prospects for a successful reorganization and performances under the Plan result in our conclusion that cause for relief

from the stay exists, pursuant to § 362(d)(1). The delay already caused by this proceeding requires us to act quickly, without giving the Debtor another chance to prolong the inevitable.

Comparison of the facts of this case with *Cann & Saul* and *Grant Broadcasting* is also instructive. The *Cann & Saul* debtor had produced and continued to produce a high quality product for almost a century. 76 B.R. at 487. Its economic failure was due largely to factors beyond its control, the national decline of the steel and nuclear-power industries. *Id.* at 481. Its management attempted to face up to the problems in issue, and its perpetuation was backed as a stable force of tax revenue and jobs in its community by all except its major secured creditor. *Id.* at 487. As a post-script, we note that its reorganization attempt failed, but only due to the last-minute collapse of negotiations for a sale of its assets to an unrelated third party after attempts to work with its secured creditor. However, when this attempt fell through, the Debtor gracefully allowed the secured creditor to obtain relief pursuant to § 362(d) and liquidate its assets.

In *Grant Broadcasting*, the management team of the Debtors impressed us very highly. 71 B.R. at 382. The Debtors' principal had been instrumental in the realization of a profit of $160 million in a period of four years in a start-up of independent television stations similar to those owned by the Debtors. *Id.* at 379. In that case, the volatile nature of the industry caused the Debtors' financial problems. *Id.* at 379–80. The Debtors ultimately successfully organized, but only at the expense of the loss of ownership and a personal investment of $2.6 million by the Debtor's principal to the creditors. However, the principal gracefully accepted the complex reorganization plan which excluded him.

Here, the Debtor had many factors which were in its favor. It was developing real estate in a spot unsurpassed in physical beauty at the time of a bull-market in Philadelphia main line real estate. Interest rates fell dramatically during the period of construction, which stimulated the industry beyond expectations which could have been projected when it began in 1984. Yet, with Trinsey at the helm, the Debtor failed in spite of all of these elements in its favor. Suffice it to say that Trinsey has not gracefully accepted the inevitable fate of this undertaking.

We regret most of all the financial losses and disappointments to be suffered by the truly innocent prospective buyers of the townhouses. Naturally, they hitched their hopes of finally obtaining their long-awaited homes and averting the loss of their deposits to Trinsey's ill-fated star. We commend Nassau for its offer to pay at least some refund to these parties, and we shall order it to do so. We also recognize that this small cushion is the product of the vigor of the efforts of Trinsey to salvage the project and the force of his able counsel's advocacy. However, to prop up the prospective purchasers with false hope that RHC would succeed without the substantial financial backing and unprecedented and probably unlikely to be duplicated series of favorable circumstances which existed during the period when the Debtor failed would be, in the long run, more cruel than cutting their hopes and losses now.

In any event, the interests of Nassau require us, on these facts, to rule as we do. We will therefore issue an order denying confirmation of the Debtor's plan and all of its other motions and granting the § 362(d) aspect of Nassau's motion, adding thereto a direction that Nassau make the payments to other creditors contemplated in its presently-proposed plan.